```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES  OF AMERICA       :              CIVIL ACTION
                                :
          v.                    :
                                :
TERRELL HAMPTON                 :              NO. 11-325
```

<u>MEMORANDUM</u>

Dalzell, J.                                February 8, 2012

      We here address the question of whether silence says anything, particularly in a federal criminal prosecution.  Almost five hundred years ago, Sir Thomas More sought to use silence as a shield, wrapping himself in the maxim "silence gives consent"[1] when all of England knew he meant no such thing about Henry VIII's Acts of Succession and Supremacy.[2]

      At a far less exalted plane, the Government here sought to make Terrell Hampton's silence a sword against him.  As this is a subject that has received relatively little judicial attention, we turn ours to it at some length.

      Specifically, the Superseding Indictment in this case charges Hampton with one count of being a felon in possession of

---

[1] Or, as More put it in that more classically-imbued age, "<u>qui</u> <u>tacit</u> <u>consentire</u> <u>videtur</u>."

[2] Memorably recorded in Paul Scofield's Academy Award-winning portrayal in <u>A Man For All Seasons</u>, (Highland Films, 1966).

a firearm, in violation of 18 U.S.C. § 922(g)(1).  At defendant's

first trial the jury could not reach a verdict and, finding

manifest necessity, we declared a mistrial.

Before the second trial began, the Government filed a

motion in limine to admit evidence of defendant's choice not to

answer certain questions during his custodial interview.  The

interrogating Secret Service agents posed these (unanswered)

questions to Hampton after he had explicitly waived his Miranda

rights and uttered only one responsive statement during the

course of the interrogation.  After receiving defendant's

response opposing the Government's motion, we ordered the parties

to familiarize themselves with four cases and several issues that

their memoranda had not addressed.  In response to our Order, the

Government filed a memorandum in further support of its motion.

Counsel then convened in Chambers on the morning of the first day

of trial to discuss the pending motion in limine.

After a brief colloquy, we denied the Government's

motion in limine under Fed. R. Evid. 403 explaining that a

memorandum would follow to fully explain our reasoning.

I.  **Factual Background**

On May 12, 2011, Secret Service agents conducted a warranted search of a house on Delancey Street in Philadelphia, Pennsylvania ("the House").  Hampton was inside the House at the time of the search, but the Government alleged -- and it has never been disputed -- that this House was not his primary residence.  The Government contended that when the agents entered the House to conduct their search that day, they saw Hampton on the stairs.  When the agents searched the dwelling -- and, more specifically, the upstairs middle bedroom -- they recovered, from under the mattress in that room, the semi-automatic firearm charged in the Superseding Indictment.

In connection with the investigation that led to the search warrant's execution, agents obtained a photograph of Hampton from his Facebook page ("Facebook photograph" or "photograph").  That photograph allegedly shows Hampton with an object in his belt that the Government contends in the Superseding Indictment is the same firearm recovered on the day of the search.

Hampton was arrested at the House.  After being taken to the Secret Service's offices in Center City, Philadelphia, Hampton signed a waiver of his <u>Miranda</u> rights.  The subsequent

interrogation took place in two parts.  The first portion focused on the felon-in-possession offense before us.  Once that part of the interview concluded, another Secret Service agent questioned Hampton about an alleged house-theft scheme that gave rise to the search of the House, but is unrelated to this felon-in-possession case.

During the course of the first part of the interview -- the only portion of the interrogation relevant to this trial -- Hampton was asked about the gun recovered at the House.  He did not answer such questions.  The agents then confronted Hampton with the Facebook photograph that showed him with an object in his belt that the Government asserts is a firearm -- indeed, the same firearm recovered from the House.  When asked about the object in the Facebook photograph, Hampton again remained silent.  But when the agents asked him a more general question about the photograph, Hampton admitted it was he in the photograph.

The Government's motion in limine sought to elicit testimony in its case-in-chief that was expected to be the same, or similar to, an agent's testimony from the first trial.[3]  In

---

[3] A [Secret Service Agent]: Then the defendant acknowledged the [Miranda] rights.  The defendant signed the form where it's identified with the X.

(continued...)

---

[3] (...continued)

       *   *   *

       Q [The Government]: Did [defendant] agree to answer questions?

       A: Yes

       Q: And did you or Special Agent Klaus or both of you pose any questions?

       A: Yes.

       Q: What question or questions were posed?

       A: Special Agent Klaus asked the individual, "Where did the gun come from?"

       Q: When you say "the individual," that was?

       A: The defendant.  "Where did the gun come from that was found during the search warrants that morning?"

       Q: And what response did you get?

       A: No response.

       Q: No response at all?

       A: No.

       Q: So then what happened?

       A: That continued just the same -- the same line of questioning.  "Did you know anything about the gun that was found in the morning during the search warrants?"  Negative response.

       Q: Okay.  So then what happened?

       A: So then I left the room to get a photograph that we had.

       *   *   *

       Q: What did you do next?

       A: We questioned the individual -- or the defendant again.  Special Agent Klaus asked him does he know anything about the gun.  Still with the negative response.

       Q: And when you say "negative response," does that mean --

       A: He did not confirm or deny any knowledge of the gun. I produced the photo and said, "What do you know about this photo?"  And the defendant looked at the photo and stated that he could not deny that it was him in the photo.

       Q: And that was it?

       A: And that was it.

       Q: And was there any further -- anything further to the interview?

                      (continued...)

particular, the Government sought admission of "evidence that, having waived his <u>Miranda</u> rights, the defendant failed to respond to questions put to him about (i) the gun found during the search of the Delancey Street House and (ii) the gun pictured in the Facebook Photograph." Mot. 1. The Government also sought leave "to comment on that failure in [its] closing argument[,]" Mot. 2, but this "comment would not be addressed to the defendant's silence, but rather to the inconsistency in the statement he knowingly and voluntarily chose to make." Mem. 13.

The Government's motion was doubtless prompted by defense counsel's objection to the Government's references to the supposed significance of those silences in closing arguments at the first trial. As we shared the defense's concerns under the recent teaching of our Court of Appeals in <u>United States v.</u>

---

[3] (...continued)
        A: We questioned him regarding -- or questioned the defendant regarding anything else in the photo and specifically pointed to what appeared to be a gun, an item that appeared to be a gun in his waistband, and he, again, did not confirm or deny any knowledge of that gun and did not respond, really, to any questioning regarding that.
        Q: So when questioning focused on the gun, you just simply didn't get a response?
        A: Correct.

12-1-2011 Tr. 189-92.

Waller, 654 F.3d 430 (3d Cir. 2011), we sustained the objection

and instructed the jury to disregard the offending references.

II.  **Analysis**

    A.  **The Evidence At Issue Is An Adoptive Admission**

        Though the Government described the evidence at issue

in its motion as a "fail[ure] to respond to questions"[4], Mot. 1,

offered for the purpose of highlighting an "inconsistency in the

statement he knowingly and voluntarily chose to make[,]" such a

description will not withstand scrutiny.  Mem. 13.  As to

Hampton's silence in response to questions about the gun in the

Facebook photo, the Government specifically sought to admit

silence evidence to counter Hampton's argument "that the gun

shown in the Facebook Photo might well be a toy or a replica of a

firearm."  Id.  The Government contended that "[i]f that were the

case, one would have expected Hampton to inform the agents of

that fact when they questioned him [after he waived his Miranda

rights].  The fact that he did not do so is entirely inconsistent

with his current claim."  Id.

---

    [4] At bottom, the Government sought to introduce
evidence of Hampton's silence in response to questions posed to
him by the interrogating agents, and we will sometimes refer to
Hampton's failure to respond as "silence evidence".

When the parties appeared in Chambers to discuss the
motion in limine before the second trial commenced, we initiated
the following exchange:

> THE COURT:  What I'm trying to zero in on is
> what exactly is the probative value of the
> silence in this context.
>
>                    *   *   *
>
> [THE GOVERNMENT]:  One of the issues that is
> in the case through examination and cross-
> examination, argument, is the replica/toy
> issue.  Was the gun in the photo truly a gun
> or was it, in fact, a replica or a toy.  And
> the defendant doesn't need to take the stand
> in order for that issue to be a part of the
> case.  It's, as the Court knows, integral to
> the case.
> THE COURT:  Correct, because the Government's
> burden is that it's a firearm.
> [THE GOVERNMENT]:  Correct.  And one of the
> arguments that counsel made through cross-
> examination and through argument in the last
> trial and I think it is -- I think it's, as
> the Court recognizes, a necessary part of
> this case is whether the gun in the photo --
> THE COURT:  Is a firearm.
> [THE GOVERNMENT]:  Is a firearm.
> THE COURT:  And that's an issue for the jury
> to decide.
> [THE GOVERNMENT]:  Correct.  And it seems to
> me that in the circumstances of this case,
> given the defendant's waiver of his Miranda
> rights followed by presentation of the
> picture with which the Court is familiar and
> his -- and his being directed to the gun in
> the picture and simply not answering, that is
> inconsistent with the argument that it was a
> toy because as --

8

```
          THE COURT:  But it's the argument that it's a
          toy.  It's not that the defendant made a
          statement that it was a toy, because there
          was no statement of any kind.
          [THE GOVERNMENT]:  Correct.  At trial.
          THE COURT:  Because that's a defense that
          [defense counsel] raised, quite properly, to
          the Government's burden[ to prove) the
          elements of the case.  But the defendant
          never said, oh, that's a toy or words cognate
          to that.  Would you agree with that?
          [THE GOVERNMENT]:  I'm shaking my head up and
          down, yes.  I do agree with you.
```

2-1-12 Draft Tr. 4-5.

Thus, put another way, the Government sought admission of Hampton's silence because it contended a reasonable jury could and should be allowed to infer an inconsistency from defendant's post-arrest, post-Miranda silence as compared against his trial counsel's argument that the Government had not met its burden of proof on an essential element of the offense.

We cannot agree that the two things the Government compared are inconsistent.  The cases that the Government cited in support of its "inconsistency" theory arose in contexts where Miranda-waiving defendants were not silent after waiving their Miranda rights, but took the stand in their own defense at trial or otherwise offered exculpatory stories against which the

silence could be compared.[5]  Thus, there were two possible
stories for the jury to compare in those cases.  Here, Hampton's
silence was not being offered to rebut or impeach any testimony
he gave at trial, since he gave none at both trials.  Indeed, our
Circuit's Model Jury Instructions are at pains to explain that
the arguments of lawyers are not evidence, and therefore cannot
be subject to evidentiary impeachment.  Third Circuit Model
Criminal Instructions 1.08 (Nov. 2011) ("The following are not
evidence: . . . [s]tatements and arguments of the lawyers for the
parties in this case[.]").  Thus, the Government sought to
compare apples with oranges, and the inconsistency argument
necessarily fails.  See United States v. Johnson, 302 F.3d 139,
146 n.7 (3d Cir. 2002) ("[B]ecause [defendant] had not yet
testified -- and thus had not testified to an exculpatory version
of events and claimed to have told the police the same version
upon arrest -- the prosecutor's question was not a permissible
use of a defendant's post-arrest silence to challenge his

---

     [5] See Adamson v. Charles, 447 U.S. 404 (1980); United
States v. Donnat, 311 F.3d 99 (1st Cir. 2002) (cited for its
characterization of Charles); United States v. Pitre, 960 F.2d
1112 (2d Cir. 1992); United States v. Goldman, 563 F.2d 501 (1st
Cir. 1977).

testimony as to his behavior following arrest." (internal

quotation marks and alterations in original omitted)).

In reality, the Government's argument distills to the

claim that defendant's silence was an "adoptive admission."[6]

This would be so because Hampton, in his silence, neither

confirmed nor denied "know[ing] anything about the gun that was

found in the morning during the search warrants[,]" 12-1-11 Tr.

191, or having "any knowledge of that [item that appears to be a

gun in his waistband of the Facebook photograph,]" Id. 192.[7]

---

[6] Fed. R. Evid. 801(d)(2)(B) provides that "A statement
that meets the following conditions is not hearsay: . . . The
statement is offered against an opposing party and: . . . is one
the party manifested that it adopted or believed to be true[.]"
Prior to the adoption of the Federal Rules of Evidence, the
"adoptive admission" was more commonly referred to as a "tacit
admission."  See Turner v. Yates, 57 U.S. 14, 27 (1853); accord
Sparf v. United States, 156 U.S. 51 (1895); United States v.
Alker, 255 F.2d 851, 852-53 (3d Cir. 1958); see also Charles W.
Gamble, The Tacit Admission Rule: Unreliable and Unconstitutional
-- A Doctrine Ripe for Abandonment, 14 Ga. L. Rev. 27 (1979).

[7] Hampton could have exculpated himself by arguing that
(1) the firearm at the House was not his, or (2) the object
depicted in the photograph was a replica or a toy.  He could not
have stated, without subjecting himself to more criminal charges,
that the object depicted in the photograph was, in fact, a
different firearm, for he would have still been admitting to
being a felon in possession of a firearm, albeit a different
firearm than the one currently charged in the Indictment and thus
to an uncharged crime.  This raises a simple but important point:
the felon in possession crime leaves little room for creative
argument.  A defendant is guilty of the crime if he is (1) a
(continued...)

The Government's contention that "one would have expected Hampton to inform the agents of [the fact that the photo might depict a toy or replica firearm] when they questioned him[,]" Mem. 13, thus amounts to an adoptive admission theory. The Government's argument may be recast in "adoptive admission" terms as follows: if defendant had been innocent of possessing a firearm at the House or in the Facebook photograph, then when the agents questioned him about those two things it would have been reasonable to expect him to disclaim any knowledge of the firearm, or object alleged to be a firearm, and thus exculpate himself.[8]

_____

[7] (...continued)
felon (2) possessing (3) a firearm.  He either meets these three criteria or he does not, especially since the mens rea component to the offense here is not a complex factual issue under the actual possession theory of the case.  But see United States v. Kitsch, No. 03-594-01, 2008 WL 2971548 (E.D. Pa. Aug. 1, 2008). Under the Government's argument, if a prior-convicted-felon defendant waived his Miranda rights and was confronted with a photograph during a custodial interrogation, and his interrogators pointed to, and asked him about, "an item that appear[s] to be a gun in his waistband[,]" 12-1-11 Tr. 192, this would be tantamount to accusing defendant of the crime charged in the Indictment, because an adoptive admission of the factual statement -- that the object at his waist in the photograph is a possessed firearm -- would conclusively satisfy the statutory elements of the offense.

[8] See Joseph M. McLaughlin, 5 Weinstein's Federal Evidence § 801.31 & text accompanying nn.23-24 (current through
(continued...)

**B.    Adoptive Admission Evidence Does Not
       Categorically Implicate Constitutional Concerns**

Now that we have identified the type of evidence the
Government sought to admit and reference in closing argument, we
consider Hampton's contentions that the admission of these
adoptive admissions would: (1) use his silence against him under
the due process rationale in Doyle and its progeny, (2) violate
his Fifth Amendment privilege against self-incrimination, and (3)
shift the burden of proof by implying defendant had the

---

[8] (...continued)
Oct. 2011) ("A party who asserts that a criminal defendant
adopted another's statement by remaining silent must show that
the statement was such that, under the circumstances, an innocent
defendant would normally be induced to respond.  Before admitting
a proffered admission by silence, the "district court must first
find that sufficient foundational facts have been introduced for
the jury reasonably to conclude that the defendant did actually
hear, understand and accede to the statement." (footnotes
omitted)).  See also 1 McCormick on Evidence § 161 & text
accompanying n.8 (6th ed. current through 2009 update) ("The
foundation necessary [to establish an adoptive admission] has
been articulated in various ways.  Best put, admission requires
preliminary proof (1) of an accusatory statement that a person
who considered himself innocent would, under the circumstances,
deny; (2) that the defendant heard and understood the accusatory
statement; (3) that the defendant had the opportunity and ability
to deny the statement; and (4) that the defendant manifested his
adoption of it or, in the case of a tacit admission, adopted it
by his silence.").

opportunity to explain himself but failed, thus violating due

process.[9]

But these arguments do not persuade.  First, Hampton's

"selective silence" may[10] be admissible since a reasonable jury

could find on the facts here that he waived his Miranda rights,

did not remain silent, and did not unequivocally re-invoke his

right to remain silent.  Thus, he shed his prophylactic right to

remain silent during the custodial interrogation, making both his

statements and silence fair game for admission without raising a

constitutional concern.[11]

---

[9] This right has its source in the Fifth Amendment of
the United States Constitution:  "No person . . . shall be
compelled in any criminal case to be a witness against himself."

[10] We use may because while admissibility may not be
barred as a matter of constitutional law, it nevertheless could
be inadmissible as a matter of the law of evidence.

[11] Doyle v. Ohio, 426 U.S. 610 (1976) and Wainwright v.
Greenfield, 474 U.S. 284 (1986) are inapplicable here because
unlike the aggrieved defendants in those cases, Hampton here did
not shroud himself completely in Miranda's inherent assurance
that one invoking the right to remain silent need not fear its
use against him.  Consequently, Hampton's statement and silence
may be admissible.  See, e.g. United States v. Vargas, 580 F.3d
274, 277-78 n.1 (5th Cir. 2009) ("[D]efendant was not silent.  He
answered several questions after the Miranda warnings had been
given, making fair game both this answers and his omissions: A
defendant cannot have it both ways. If he talks, what he says or
omits is to be judged on its merits or demerits." (citations and
internal quotation marks omitted)); United States v. Jumper, 497
F.3d 699, 704 (7th Cir. 2007) ("To be clear, in order for a
(continued...)

Second, despite Hampton's contention that his privilege against self-incrimination would be violated, a reasonably jury could, as already noted, have found that he waived and did not

---

[11] (...continued)
defendant to have a right to remain silent as to a <u>specific or selective question</u> (and the corresponding right that the prosecution will not comment on this silence), the defendant must indicate in some manner that he is invoking that right.") (emphasis added); <u>United States v. Burns</u>, 276 F.3d 439, 442 (8th Cir. 2002) (holding "where the accused initially waives his or her right to remain silent and agrees to questioning, but subsequently refuses to answer further questions, the prosecution may note the refusal because it now constitutes part of an otherwise admissible conversation between the police and the accused" and defendant's "silent response to one inquiry during the interrogation and eventual refusal to respond to further questioning were part of an otherwise admissible conversation and that the admission of the conversation in its entirety did not violate his due process rights") (internal quotations omitted); <u>United States v. Goldman</u>, 563 F.2d 501, 503 (1st Cir. 1977) (holding "defendant did not stand on his [<u>Miranda</u>] rights. . . . [a]fter hearing the <u>Miranda</u> warnings, he chose to make an exculpatory statement, and he answered <u>most</u> of the agent's questions probing that statement. . . . [constituting] proof of waiver[,]" and thus not a constitutional bar to admissibility (emphasis added)); <u>United States v. Tramunti</u>, 513 F.2d 1087, 1115 (2d Cir. 1975) ("But <u>Miranda</u> does not prevent the interrogating officer from drawing reasonable inferences from the behavior of the person being questioned, in this case, a refusal to answer specific questions asked her by the Government agents after responding to others."); <u>cf.</u> <u>United States v. Agee</u>, 597 F.2d 350, 356 (3d Cir. 1979) (<u>en</u> <u>banc</u>) ("Agee did not exercise his right to remain silent <u>regarding the facts of the incident</u>. Nor did the prosecutor suggest that he did.  Instead, the thrust of her questions and her argument was that Agee made a deliberate choice to lie to the police in order to conceal from them an ongoing crime[]" thus "even a casual reading of the record reveals that Agee simply did not remain silent <u>regarding the facts of the crime with which he was charged</u>." (emphasis added)).

re-invoke his <u>Miranda</u> rights.  In other words, Hampton negated or waived any privilege against a self-incrimination argument that might otherwise have arisen at trial because of an alleged coercive custodial interrogation.[12]  <u>See</u> <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250, 2260 (2010), ("[Defendant] did not say that he wanted to remain silent or that he did not want to talk with the police. . . . [Thus, he did not] invoke[] his right to cut off questioning. . . . [nor] did [he] invoke his right to remain silent.") (citations and internal quotation marks omitted)); <u>United States v. Teleguz</u>, 492 F.3d 80, 88 (1st Cir. 2007) ("A defendant's choice, after signing a <u>Miranda</u> waiver, to selectively answer questions, is not in itself an unequivocal assertion of his right to remain silent.").

Third, though Hampton's due process burden-shifting argument has first blush appeal, it will not withstand careful

_____

[12]    <u>See</u> 1 <u>McCormick on Evidence</u> § 118 & text accompanying n. 17 ("The privilege [against self-incrimination] of one undergoing custodial interrogation by law enforcement officers is violated if the officers do not warn the person of the Fifth Amendment's application and before any interrogation elicit an effective waiver of the right to the presence of counsel.  In th[is] context[], the privilege is truly one to remain silent or completely passive, not simply a right to invoke the privilege and thus avoid compelled self-incrimination.").

scrutiny.[13]  A defendant bears no burden in the context of the adoptive admission inquiry.  Instead, the Government, as the proponent of the adoptive admission, carries the evidentiary burden of convincing the Court "whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement." United States v. Jinadu, 98 F.3d 239, 244 (6th Cir. 1999); see United States v. Ward, 377 F.3d 671, 675 (7th Cir. 2004); Vazquez v. Lopez-Rosario, 134 F.3d 28, 35 (1st Cir. 1998) (reasoning that proponent must "convince the [district court] that in the circumstances of the case a failure to respond is so unnatural that it supports the inference that the party acquiesced in the statement[]" (emphasis added) (internal quotation marks omitted)); United States v. Monks, 774 F.2d 945, 950 (9th Cir. 1985).  In fact, our Circuit's Model Instructions recommend a jury instruction for this purpose that tracks this very

---

[13] It is understandable that Hampton would raise this argument given the parties' mutual confusion over the precise nature of the Government's silence evidence.

language.[14]   If this instruction had been given, it would have

likely been accompanied by a general instruction on the

---

[14]   Our Circuit's Model Jury Instruction 4.34 for
"silence in the face of accusation" is also a helpful guide.   The
unedited instruction reads:

> You heard evidence that (name of person who
> made accusatory statement) made a statement
> accusing (name of defendant) of the crime
> charged in the indictment, and that (name of
> defendant) did not (deny the accusation)
> (object to the statement) (contradict the
> statement).   If you find that (name of
> defendant) was present and actually heard and
> understood the statement, and that it was
> made under such circumstances that (name of
> defendant) would be expected to (deny the
> accusation)(object to the statement)
> (contradict the statement) if it was not
> true, then you may consider whether (name of
> defendant)'s silence was an admission of the
> truth of the statement.

In addition, the commentary accompanying the Instruction 4.34
notes that "[a]n instruction on this topic should be given only
rarely and always with great caution.   In criminal cases, courts
must carefully assess the admissibility of a statement that would
otherwise be hearsay on the basis that the defendant adopted the
statement by silence under Federal Rules of Evidence, Rule
801(d)(2)(B).   In some instances, the defendant's silence in the
face of accusation is admissible" (emphasis added).   As noted
above, this is one of those instances where a defendant's silence
is admissible because he waived his Miranda rights, was
selectively silent, and failed to re-invoke his rights.   We take
note of the Commentary's advice that Instruction 4.34 "should be
given only rarely and always with great caution" in our analysis
here.

presumption of innocence and burden of proof.  Third Circuit

Model Criminal Jury Instructions 1.13.

At most, our Circuit's Model Instruction allows the

jury to reach a permissive inference (not a presumption) that

defendant acquiesced to these statements of fact.  See Sandstrom

v. Montana, 442 U.S. 510, 515-17 (1979).  This permissive

inference of an adoptive admission is in accord with Hampton's

constitutional due process trial rights because it does not (1)

conflict with the presumption of innocence, nor (2) alter the

Government's burden of production on each essential element of

the offense.  The factfinding function of the jury is preserved

because the jury is obliged to consider whether [defendant]'s

silence was an admission of the truth of the statement[,] and

thus a far cry from a conclusive presumption against defendant.

See id. at 523.  Furthermore, inviting the jury to entertain the

question of whether an adoptive admission arose does not

impermissibly shift the burden to the defendant because, as the

language we have canvassed shows, the defendant is never called

upon to adduce or refute any facts.  The onus is thus on the

Government alone to establish an adoptive admission.

Rather to the point here, no part of the Instruction

suggests defendant had a duty to speak -- the language merely

requires the jury to consider whether the circumstances were such that an innocent defendant would be expected to deny, object to, or contradict the statement offered as an adoptive admission. Third Circuit Model Criminal Jury Instructions 4.34.  The defense can hold the Government to its burden without incurring any additional duties by asserting the defense (as it does here) that the Government has failed to carry its burden of proving the existence of an adoptive admission -- which is also an essential step here.  See In re Winship, 397 U.S. 358, 364 (1970) (due process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); see generally Paul H. Robinson, et al., 1 Criminal Law Defenses § 33 (current through June 2007).

## C.   The Alleged Adoptive Admission Here Is Inadmissible Under Rule 403

This brings us at last to our core inquiry: did the Government carry its burden of proof on the adoptive admission it sought to enter into evidence?  Has the Government here convinced us that a reasonable jury could infer that "sufficient foundational facts [have been alleged] . . . that the defendant heard, understood, and acquiesced in the statement[ offered as an

adoptive admission,]" and "whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond"?  <u>Jinadu</u>, 98 F.3d at 244.

Since the agents' interrogation of Hampton took place in a small room and involved, at most, four individuals (including the defendant), a reasonable jury could indeed reasonably infer that Hampton heard and understood the questions that he left unanswered about the firearm recovered at the House and the object alleged to be a firearm in the photograph.

But it is far less clear if a jury could reasonably infer anything from Hampton's silence in the face of the unanswered statements.  This inquiry distills to a determination of the probative value of Hampton's silence.[15]  We find Judge Hastie's commentary in <u>United States v. Brierly</u>, 387 F.2d 597, 600 (3d Cir. 1967), on the adoptive admission's historical

---

[15]   Since we dismiss the Government's motion on Rule 403 grounds, we observe that the "acquiescence" inquiry under Rule 801(d)(2)(B) and the "probative value" inquiry under Rule 403 considerably overlap.  In fact, given that they are nearly co-extensive, we will import reasoning from Rule 403 and substantively related cases to avoid duplicative analysis.

predicate -- the "tacit admission rule" -- persuasive.[16]  He

wrote that:

> We begin with the relevant, though not
> necessarily decisive observation, that one's
> normal response to hearing derogatory
> statements about himself is substantially
> inhibited by the very fact that he is under
> arrest on a criminal charge and is being
> questioned by police officers in an obvious
> effort to substantiate that charge.  <u>On such
> an occasion a prisoner is likely to be wary
> and cautious.  The circumstances simply are
> not such as to evoke a spontaneous response
> to an accusatory statement.</u>  Yet, the sole
> justification for the tacit admission
> doctrine is the psychological premise that,
> normally, an innocent person confronted with
> a charge of wrongdoing will be strongly
> impelled to utter a spontaneous denial.
> Thus, <u>it is difficult at best to justify the
> application of the tacit admission concept to
> a prisoner's response when confronted by the
> police with a statement accusing him of
> complicity [or a photograph more or less
> doing the same] in the very crime for which
> he has been arrested.</u>

<u>Id.</u> (emphasis added).  Judge Hastie's reasoning holds true

regardless of whether a defendant has or has not been <u>Mirandized</u>

or waived his <u>Miranda</u> rights because the underlying circumstances

---

[16]     <u>Brierly</u> defined the tacit admission rule as: "the
incriminating statement could be considered as probative against
[defendant] only if [the jury] should find that an innocent
person in [defendant's] position would have denied the accusation
and that [defendant's] failure to do so reflected consciousness
of guilt."  <u>Id.</u> at 599.

remain that "a prisoner is likely to be wary and cautious. . . . [and] not such as to evoke a spontaneous response to an accusatory statement." Id. Judge Hastie's comment is congruent with Justice Marshall's reasoning for the Supreme Court in United States v. Hale, 422 U.S. 171 (1975),[17] observing that "silence during police interrogation lacked significant probative value[.]" Agee, 597 F.2d at 357 (quoting Hale, 422 U.S. at 177).

While, as Judge Hastie notes, it may be "difficult" in particular cases to justify the tacit admission rule, we are obliged to apply it here as an adoptive admission. During his interrogation, Hampton neither confirmed nor denied "know[ing] anything about the gun that was found in the morning during the search warrants[,]" 12-1-11 Tr. 191, or having "any knowledge of that [item in his waistband of the Facebook photograph that was pointed at by agents and alleged to be a gun by them.]" Id. 192.

_____

[17] Our Court of Appeals summarized Hale as follows: "the Supreme Court, exercising its supervisory authority over the federal courts, held that a federal prosecutor cannot cross-examine a defendant about his post-arrest, post-Miranda-warnings silence because its prejudicial effect substantially outweighs its probative value.  The Court explained that a defendant's silence in this situation was ambiguous and had little probative value because it can as easily be taken to indicate reliance on the right to remain silent as to support an inference that [his] explanatory testimony was a later fabrication." United States v. Johnson, 302 F.3d 139, 145-46 (3d Cir. 2002) (internal quotations omitted).

His only articulated comment was his confirmation of his identity
in a photograph that the agents had already procured from his
Facebook page after sending him a "friend" request using an
agency account.[18]   To gauge the extent to which Hampton's
selective silence is probative of his acquiescence, a comparison
of our facts to those in United States v. Goldman, 563 F.2d 501
(1st Cir. 1977), and United States v. Agee, 597 F.2d 350 (3d Cir.
1979) (en banc) will be instructive.   We find under our facts and
in light of these cases that the Government's proffer of the
adoptive admissions barely satisfies the acquiescence prong of
the analysis.   Put another way, Hampton's silence is only
marginally probative of his acquiescence to these statements.

Goldman and Agee found adequate probative value of
silence in light of Hale's silence-skeptical evidentiary rule.
In Goldman, the First Circuit held that "[w]hat [defendant] said
[during the "exculpatory story" delivered during his
interrogation following the waiver of his Miranda rights]
provided a context that enhanced the probative value of his

---

[18] Though he waived his Miranda rights, Hampton spoke
only once during this interrogation on the two subjects at issue
here, and only when the agent produced the photo and said, "What
do you know about this photo?"   After looking at it, Hampton
merely "stated that he could not deny that it was him in the
photo."   12-1-11 Tr. 191-92.

silent response to a particular question." Goldman, 563 F.2d at
503-04. Our Court of Appeals in Agee, 597 F.2d at 356, twice
made the point that defendant "simply did not remain silent
regarding the facts of the crime with which he was charged" and
was not "silent regarding the facts of the incident."
Consequently, in considering Hale's application to the facts,
Agee held that defendant's later statements "regarding what he
chose to do and say when he approached the police officers
provided a context which emphasized the probative value of what
he chose not to say to the police." Id. at 357.

        To be sure, Hale is not directly applicable to the
facts here since it involved the introduction of defendant's
silence for impeachment purposes following his invocation of his
right to remain silent. We nevertheless take the silence-
skeptical statements in Hale, Goldman and Agee to counsel
hesitation regarding any probative value of Hampton's selective
silence. Considering Hampton's silence in the context of his one
and only statement to the agents, his failure to answer any
questions about the firearm recovered at the House is of little
probative value to a claim of acquiescence since the firearm at
the heart of the questioning -- and of this prosecution -- was
not recovered from Hampton's person but from under a bed in a

house that was not his primary residence.  Thus, in the setting
of Hampton's interrogation -- such as it was -- it is likely that
Hampton may have had no idea that the firearm was in the
residence.  Thus, an adverse inference would be too speculative
to pass Rule 403 muster.

          To be sure, Hampton's voluntary identification of
himself in the photograph provides some probative value for the
claim that he adopted the contention that the object in the
photograph was a firearm.  His failure to answer questions about
the object alleged to be a firearm could reasonably be construed
as disingenuous since he would have had first-hand knowledge of
what was in his belt on his waist.  But the probative heft of
this silence is offset since Hampton never offered an exculpatory
story during his interrogation or at trial from which any
inconsistency or ulterior motive could be inferred.  In addition,
Hampton's sole statement pertinent to the felon in possession
charge did not address facts relevant to the essential elements
of the felon-in-possession case -- namely the possession of the
recovered firearm or the particulars of the gun within the
statutory meaning of a firearm.

          It also warrants reiteration to note that Hampton's
silence about the felon-in-possession case under questioning here

occurred during a custodial interrogation.  It was precisely such a circumstance that both Justice Marshall and Judge Hastie reasoned would lead an accused "to be wary and cautious" with his answers and would likely minimize the potential for a spontaneous response to an accusatory statement given the inherent power imbalance between the accused and the accuser.  See Hale, 422 U.S. at 176-77; Brierly, 387 F.2d at 600.

Given the radical power imbalance in play during a custodial interview, it is also unclear whether an innocent defendant would normally be induced to speak up or remain "wary and cautious."  This is why the jurisprudence in this area understandably avoids categorical rules and instead approaches those questions with a hefty skepticism toward the Government.

Thus, even if the Government's proffer of the adoptive admissions satisfied its own threshold test for admissibility, it does not necessarily follow that it survives a Rule 403 balancing.[19]  See United States v. Musquiz, 45 F.3d 927, 930-31 (5th Cir. 1995) (applying a probative value versus prejudice

---

[19] Fed. R. Evid. 403 provides that: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

balancing to defendant's argument).  As noted earlier, the "acquiescence" and probative value inquiries are largely the same, and we have already concluded that, on the whole, the probative value of defendant's silence here is minuscule.

Drawing again on the teachings of <u>Hale</u> and <u>Brierly</u>, we note that silence has great potential for unfair prejudice because the jury -- untutored in Justice Marshall's and Judge Hastie's healthy skepticism -- is likely to draw a strong negative inference from a defendant's failure to immediately tell the police what happened.  <u>Johnson</u>, 302 F.3d at 146 (quoting <u>Hale</u>, 422 U.S. at 180).  This potential for unfair prejudice is especially grave here because Hampton <u>never</u> provided a contradictory statement -- or, indeed, any exculpatory statement -- regarding evidence pertinent to his felon in possession case. As a result, Hampton's "story," in a sense, has been consistent over the course of this litigation because he never advanced one. He has left it to the Government to carry its burden of proving its case against him with the evidence that it collected from the House and through its online investigation.[20]

---

[20] In fact, with the benefit of hindsight, the second jury convicted defendant on the sole felon-in-possession count <u>without</u> the admission of his silence.

28

Though we tell jurors that they are to follow our instructions and accept with no adverse inference defendant's right <u>not</u> to testify at trial, we are nevertheless concerned that allowing the Government to introduce evidence and comment on defendant's silence without anything to measure that silence against invites a degree of confusion in the minds of the jurors that an instruction is unlikely to remedy.  <u>See</u> <u>Bruton v. United States</u>, 391 U.S. 123, 135-36 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").  Here, the implications of defendant's minimally probative silence would have been powerfully incriminating because of its alluring logical appeal to ordinary, innocent people -- <u>i.e.</u>, jurors -- who naturally would be unaware of the reality of custodial wariness and caution that <u>Hale</u> and <u>Brierly</u> identify.

In the end, we heed the warnings of Justice Marshall and Judge Hastie and hold that the danger of unfair prejudice to Hampton substantially outweighed the <u>de minimis</u> probative value of his silence to establish acquiescence.  We therefore denied

the Government's motion to admit and comment on evidence of

Hampton's silence in its case-in-chief and in closing argument.


BY THE COURT:

__\s\Stewart Dalzell